UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



| | )
---|---
PITTSFIELD GENERATING COMPANY, L.P., | )
 | )
Plaintiff, | )
 | )
v. | )  CIVIL ACTION
 | )  NO.
 | )  04-30128-MAP
DEVON CANADA CORPORATION, | )
 | )
Defendant. | )
 | )

## COMPLAINT FOR DECLARATORY JUDGMENT

In this action, Pittsfield Generating Company, L.P. ("PGC") seeks a declaration of its rights and obligations under a Natural Gas Purchase and Sale Agreement with Devon Canada Corporation ("Devon") dated August 23, 1995, as amended by Amendment No. 1 dated July 1, 2002 (the "Gas Purchase Agreement") and a Renegotiation/Arbitration Agency Agreement with Devon dated August 23, 1995 (the "Agency Agreement"). As set forth more fully below, PGC seeks declarations that: (1) neither the Gas Purchase Agreement nor the Agency Agreement prohibits PGC from terminating the Power Sale Agreements; (2) neither the Gas Purchase Agreement nor the Agency Agreement prohibits PGC from negotiating agreements to resell, or from reselling, to third parties natural gas purchased from Devon under the Gas Purchase Agreement, regardless of whether or not the Power Sale Agreements remain in effect; (3) Devon would be in breach of the Gas Purchase Agreement if it were to terminate its performance under that agreement based solely on PGC's termination of the Power Sale Agreements and/or PGC's resale to third parties of natural gas purchased pursuant to the Gas Purchase Agreement; and (4) Devon would be in breach of the Gas Purchase Agreement if it were to withhold its consent to PGC's assignment of the Gas Purchase Agreement based solely on the fact that Power Sale

-2-

Agreements were no longer in effect and/or the natural gas purchased from Devon would not be used to fuel the Facility.

## I. THE PARTIES

1. Plaintiff PGC is a Delaware limited partnership with its principal place of business at 235 Merrill Road, Pittsfield, Massachusetts. PGC was formerly known as Altresco Pittsfield, L.P.

2. PGC operates an electric power generation facility located in Pittsfield, Massachusetts (the "Facility"). The Facility utilizes natural gas as its sole source of fuel to generate steam and electricity which it sells to third parties.

3. On information and belief, Devon is a Canadian corporation with its principal place of business at 1600, 324 – 8th Avenue S.W., Calgary, Alberta, Canada, and is in the business of selling natural gas. Devon is a successor in interest to Home Oil Company Limited.

## II. JURISDICTION

4. This Court has subject matter jurisdiction over this action pursuant to: (i) 28 U.S.C. § 2201 because it involves a request for declaratory judgment in a case of actual controversy and is brought pursuant to Rule 57 of the Federal Rules of Civil Procedure to determine the respective rights and liabilities of the parties under the Agency Agreement and the Gas Purchase Agreement; and (ii) 28 U.S.C. § 1332, because plaintiff and defendant are residents of the United States and Canada respectively and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has personal jurisdiction over defendant Devon because Devon has minimum contacts with this jurisdiction. The claims asserted by PGC against Devon arise from some of those contacts.

6. Venue in this court is appropriate pursuant to 28 U.S.C. 1391.

### III. FACTS

#### A. The Power Sale Agreements

7. On or about February 20, 1992, PGC (at that time known as Altresco Pittsfield, L.P.) entered into two Power Sale Agreements (collectively, the "Power Sale Agreements"): (a) one with Commonwealth Electric Company; and (b) one with Cambridge Electric Light Company (collectively, the "Power Purchasers"). The substantive provisions of the two Power Sale Agreements are identical in all respects material to the claims asserted herein.

8. Pursuant to the Power Sale Agreements, PGC agreed to sell, and the Power Purchasers agreed to purchase, electric power produced at the Facility.

9. The price at which PGC sells power to the Power Purchasers under the Power Sale Agreements is governed by Article 5 and Appendix B of those agreements. One component of the price is the "Monthly Energy Charge" which is based on the amount of electricity delivered by PGC, multiplied by a "Kilowatthour Charge." The Kilowatthour Charge is indexed to the market price of certain fossil fuels, including natural gas.

10. Pursuant to Section 3 of Appendix B of the Power Sale Agreements, once every five years, either PGC or the Power Purchasers may require a renegotiation of the Monthly Energy Charge, including the Kilowatthour Charge. If such renegotiation efforts fail, either party to the Power Sale Agreements may submit the matter to binding arbitration. Such procedures, including the renegotiation and possible arbitration of the Monthly Energy Charge, are referred to as the "Price Renegotiation/Arbitration."

11. The purpose of any such Price Renegotiation/Arbitration is to modify the Monthly Energy Charge, which represents the fuel cost associated with generating the electricity being sold to the Power Purchasers. The objective of such Price Renegotiation/Arbitration is to set the Monthly Energy Charge so that it reflects a gas price that is comparable to the prices paid for gas in Connecticut, Massachusetts and Rhode Island. Notwithstanding market conditions, Section 3 of Appendix B of the Power Sale Agreements stipulates that the Monthly Energy Charge shall

not be increased or decreased by more that seven and one-half percent (7.5%) during any single Price Renegotiation/Arbitration.

### B. The Gas Purchase Agreement

12. On or about August 23, 1995, PGC (at that time known as Altresco Pittsfield, L.P.) entered into a Gas Purchase Agreement with Home Oil Company Limited (predecessor in interest to Devon). The term of the Gas Purchase Agreement continues through October 31, 2011.

13. The Gas Purchase Agreement obligates Devon to sell and deliver to PGC up to 11,757 mcf per day of natural gas. The actual volumes of natural gas that Devon is obligated to sell and deliver are determined by PGC pursuant to daily nominations.

14. The price at which natural gas is sold under the Gas Purchase Agreement consists of a base price, which is adjusted monthly in accordance with an index as set forth in Schedule A thereto.

15. Section 8.4 of the Gas Purchase Agreement provides, in substance, that subject to certain conditions, whenever there is a Price Renegotiation/Arbitration under the Power Sale Agreements, the base price of natural gas sold under the Gas Purchase Agreement will be reset by the same percentage change that the Kilowatthour Charge component of the Monthly Energy Charge is adjusted under the Power Sale Agreements.

16. No provision in the Gas Purchase Agreement obligates PGC to use natural gas purchased under the Gas Purchase Agreement to operate the Facility. To the contrary, Section 4.8 of the Gas Purchase Agreement, states:

> **Resale Rights.** Nothing in this Agreement shall restrict [PGC] from reselling any Gas purchased hereunder or from using any such Gas for purposes other than consumption by the Facility.

17. The Gas Purchase Agreement contains an integration clause stating that it constitutes the entire agreement between the parties with respect to the subject matter thereof.

18.     No term of the Gas Purchase Agreement states that its duration or validity depends on the continued existence of the Power Sale Agreements or conditions Devon's obligation to supply gas on the continued existence of those agreements.

### C.  The Agency Agreement

19.     At the time PGC and Devon entered into the Gas Purchase Agreement, they also executed an Agency Agreement.

20.     Pursuant to Section 3.01 of the Agency Agreement, PGC agreed to act as Devon's agent in respect of each Price Renegotiation/Arbitration under the Power Sale Agreements and to use all reasonable commercial efforts acting in that capacity.

21.     Section 2.03 of the Agency Agreement states:

> It is the intention of each of the Parties that the manner in which the Gas Price under the Gas Purchase Agreement is calculated will reflect, in all respects, the manner in which the Kilowatthour Charge is calculated under the Power Sales Agreement and that no dichotomy or conflict will exist between the manner in which the Kilowatthour Charge is calculated under the Power Sales Agreement and the manner in which the Monthly Gas Commodity Charge is calculated under the Gas Purchase Agreement.

### D.  Pending Price Renegotiation/Arbitration

22.     By letters dated November 25, 2003, Devon requested that PGC commence a Price Renegotiation/Arbitration with the Power Purchasers. Devon later informed PGC that it had retained a consultant who had determined that PGC was entitled to the maximum price adjustment of 7.5% pursuant to a Price Renegotiation/Arbitration. Pursuant to the Gas Purchase Agreement, any such increase in the price paid by the Power Purchasers under the Purchase Sale Agreements would flow through to Devon under the Gas Purchase Agreement.

23.     On December 22, 2003, PGC notified the Power Purchasers that it was initiating a Price Renegotiation/Arbitration under the Power Sale Agreements and forwarded Devon's statement that a 7.5% increase in the Kilowatthour Charge was warranted.

24.     On or about January 14, 2004, PGC informed Devon at a meeting in Calgary that PGC was considering terminating the Power Sale Agreements and that if it did so, it would likely

seek to assign the Gas Purchase Agreement or resell the gas purchased thereunder to a third party. Devon stated that if PGC terminated the Power Sale Agreements, it would no longer deliver natural gas under the Gas Purchase Agreement.

25. In a letter dated February 11, 2004, PGC offered to appoint Devon as PGC's agent for the limited purpose of participating in the Price Renegotiation/Arbitration. That letter states:

> Finally, to enhance the efficiency of the Renegotiation/Arbitration Proceeding, please consider whether, in lieu of the current agency arrangement between Devon and PGC, it makes sense for PGC to appoint Devon as its agent for the limited purpose of participating in the Renegotiation/Arbitration Proceeding.

26. The appointment of Devon as PGC's agent would have allowed Devon to proceed with the Price Renegotiation/Arbitration directly with the Power Purchasers rather than through PGC. Devon declined this offer.

27. During subsequent communications between Devon and PGC, Devon asserted that PGC had a conflict of interest by virtue of its obligations to act as agent for Devon in the Price Renegotiation/Arbitration and its interest in assigning the Gas Purchase Agreement or reselling natural gas purchased thereunder to a third party. According to Devon, that conflict arose because, to the extent that the Price Renegotiation/Arbitration resulted in an increase in the Monthly Energy Charge, which would also result in an increase in the base price of natural gas under the Gas Purchase Agreement, the value of PGC's rights under the Gas Purchase Agreement would diminish.

28. By letter dated February 26, 2004, PGC again offered to allow Devon to act as PGC's agent for purposes of the Price Renegotiation/Arbitration in order to enable Devon to communicate its position directly to the Power Purchasers. Devon again rejected that offer.

29. In order to avoid any appearance of a conflict of interest, PGC unilaterally terminated discussions it had initiated with Devon regarding a buyout or assignment of the Gas Purchase Agreement.

30. In a February 27, 2004 letter to PGC, Devon stated that it had a "clear understanding" that the Gas Purchase Agreement does not contemplate the severance of that agreement from the Facility and that if PGC were to sell gas obtained from Devon to supply third parties, "Devon would consider that to be a breach of the Agreement of such a fundamental nature as would relieve Devon of its obligation to continue to deliver the gas."

31. Section 16.1 of the Gas Purchase Agreement required Devon to act reasonably in determining whether to consent to an assignment of the Gas Purchase Agreement by PGC. Notwithstanding that obligation, Devon stated in its February 27, 2004 letter to PGC that it would not consent to any assignment of the Gas Purchase Agreement to a third party that did not intend to use the natural gas supplied thereunder to serve the Facility. Devon also stated that, if PGC attempted any such assignment, Devon would have no obligation to deliver natural gas under the Gas Purchase Agreement.

32. Finally, Devon stated in its February 27, 2004 letter that if PGC resold gas purchased from Devon to a third party for any use other than to fuel the Facility Devon would not deliver natural gas under the Gas Purchase Agreement. Devon wrote:

> [I]f [PGC] were to purport to utilize this gas for a purpose other than as contemplated by the terms of the Agreements, such as for example to supply third parties, then Devon would consider that to be a breach of the Agreement of such fundamental nature as would relieve Devon of its obligation to continue to deliver the gas.

33. In a letter dated March 18, 2004, Devon reaffirmed its February 27 statement that it would stop delivering natural gas to PGC if PGC terminated the Power Sale Agreements and resold gas it purchased from Devon to third parties.

34. On or about March 4, 2004, Devon informed PGC that it had decided to initiate an arbitration to establish revised pricing under the Power Sale Agreements. Later the same day, Devon informed PGC that it was not instructing PGC to initiate such an arbitration.

35. At all times since Devon initiated the Price Renegotiation/Arbitration, PGC has fulfilled its agency obligations and has followed, and still remains ready to follow, Devon's instructions with respect to such Price Renegotiation/Arbitration.

### E. Termination of Power Sale Agreements

36. On June 2, 2004, PGC executed certain termination agreements (the "Termination Agreements") with the Power Purchasers pursuant to which the parties agreed to terminate the Power Sale Agreements, subject to regulatory approval and certain other conditions precedent.

37. If the Power Sale Agreements are terminated, PGC intends to resell to one or more third parties natural gas purchased under the Gas Purchase Agreement.

38. Devon's threat to cease delivering natural gas under the Gas Purchase Agreement if the Power Sale Agreements are terminated is interfering with PGC's efforts to negotiate the resale of natural gas to third parties or an assignment of the Gas Purchase Agreement.

### COUNT I
### Declaratory Relief, 28 U.S.C. § 2201

39. PGC restates and realleges the previous numbered allegations as if fully set forth herein.

40. PGC believes that no term of the Gas Purchase Agreement or the Agency Agreement prevents PGC from: (i) terminating the Power Purchase Agreement; or (ii) selling gas purchased under the Gas Purchase Agreement to third parties.

41. Devon has asserted that PGC's termination of the Power Purchase Agreement and subsequent sale to third parties of natural gas purchased under the Gas Purchase Agreement constitutes a breach of PGC's obligations under the Agency Agreement.

42. Devon has stated that it will cease delivering gas under the Gas Purchase Agreement if PGC terminates the Power Purchase Agreements and resells to third parties natural gas purchased from Devon.

43. PGC intends to negotiate third party supply contracts with other entities. The uncertainties created by Devon's threats to cease delivering gas under the Gas Purchase Agreements are currently inhibiting PGC's efforts to negotiate the terms of such contracts.

44. If Devon were to cease selling gas to PGC if the Power Sale Agreements are terminated, as it has stated it would do, PGC would be injured because it would: (i) inhibit PGC's fulfillment of its obligations under the Power Supply Agreements until those agreements are officially terminated; and (ii) prevent PGC from exercising its rights under the Gas Purchaser Agreement to resell gas purchased thereunder to third parties.

45. Based on the preceding allegations, a present controversy exists between PGC and Devon regarding their respective rights under both the Agency Agreement and the Gas Purchase Agreement.

WHEREFORE, PGC respectfully requests that this Court:

A. Declare that neither the Gas Purchase Agreement nor the Agency Agreement prohibits PGC from terminating the Power Sale Agreements;

B. Declare that neither the Gas Purchase Agreement nor the Agency Agreement prohibits PGC from negotiating agreements to resell, or from reselling, to third parties natural gas purchased from Devon under the Gas Purchase Agreement, regardless of whether or not the Power Sale Agreements remain in effect;

C. Declare that Devon would be in breach of the Gas Purchase Agreement if it were to terminate its performance under that agreement based solely on PGC's termination of the Power Sale Agreements and/or PGC's resale to third parties of natural gas purchased pursuant to the Gas Purchase Agreement;

D. Declare that Devon would be in breach of the Gas Purchase Agreement if it were to withhold its consent to PGC's assignment of the Gas Purchase Agreement based solely on the fact that Power Sale Agreements were no longer in effect and/or the natural gas purchased from Devon would not be used to fuel the Facility; and

E.   Award PGC such other and further relief as the Court deems just and proper.

**PITTSFIELD GENERATING COMPANY, L.P.**

By its attorneys,

/s/ Robert J. Muldoon
Robert J. Muldoon, BBO# 359480
David A. Brown, BBO# 556161
Sherin and Lodgen LLP
101 Federal Street
Boston, Massachusetts 02110
(617) 646-2000

Dated: July 7, 2004